743 P.2d 70

**Steven Dean RANSOM and Debra Jean Ransom, Plaintiffs-Appellants,**

v.

**CITY OF GARDEN CITY, Defendant-Respondent,**

and

**Jim Duane Inama and John Austin Bergan, Defendants.**

**No. 16430.**

Supreme Court of Idaho.

July 24, 1987.

Ringert, Clark, Harrington, Reid, Christenson & Kaufman, Boise, for appellants. Michael J. Gaffney argued.

Eberle, Berlin, Kading, Turnbow & Gillespie, Chartered, Boise, for respondent. William A. Fuhrman argued.

DONALDSON, Justice.

The Ransoms appeal a grant of summary judgment in favor of Garden City. The trial court held their action barred by provisions of the Idaho Tort Claims Act.

The pertinent facts are as follows: In the early morning hours of November 9, 1984, a Garden City police officer stopped a vehicle owned and operated by John Bergan. In the vehicle was a passenger, Jim Inama. Bergan was arrested for driving under the influence. Before leaving for the station, Bergan expressed apprehension that his vehicle would be impounded. The officer had concluded that Inama, too, was under the influence, and declared that Inama would not be permitted to operate the motor vehicle. Inama twice attempted to contact friends to retrieve both him and the vehicle, but failed. The officer then removed the vehicle from the roadway to a nearby parking lot. At the request of Bergan, the officer gave the keys to Inama, instructing him not to drive the vehicle, but to pursue calling friends. The police officer departed with Bergan in custody. Later, Inama drove the vehicle in the wrong direction down a one-way boulevard, colliding head-on with the Ransoms. Ransoms brought suit against Bergan, Inama and Garden City; and subsequently, resolved their claims against Inama and Bergan. The action was carried forward against Garden City.

In their complaint, the Ransoms allege that the Garden City police officer was negligent in entrusting the Bergan vehicle keys to Inama. On Garden City's motion for summary judgment, the court, however, ruled that the city was immune from liability because of the "discretionary func-

tion" exception to government tort claim liability as set forth in I.C. § 6–904(1). In reaching its decision that the conduct was entitled to immunity, the trial court relied on I.C. § 49–692 which the court read as allowing an officer the option of either impounding the motor vehicle or allowing the owner to arrange for its custody, where feasible.[1] The trial court reasoned that the choice made by the officer between the two alternatives was a "discretionary function" within the meaning of I.C. § 6–904(1).

The Tort Claims Act subjects the state and its political subdivisions to liability for its negligent or otherwise wrongful acts or omissions. *See* I.C. § 6–903. However, the Act also provides exceptions to liability in I.C. § 6–904. Garden City relies on the so-called "discretionary function" exception to liability which is contained in the second clause of I.C. § 6–904(1):

"**6–904. Exceptions to governmental liability.**—*A governmental entity and its employees* while acting within the course and scope of their employment and without malice or criminal intent *shall not be liable for any claim* which:

"1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or *based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.*" (Emphasis added.)

■ The discretionary function exception applies to government decisions entailing planning or policy formation. *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986). In suits brought under the Tort Claims Act,

the "planning/operational" test is used to demarcate decisions involving the formation of basic policy, entitled to immunity, from decisions involving the execution or implementation of that policy, not entitled to immunity. *Id.*, at 232, 723 P.2d at 776.

We emphasized in *Sterling* that the "planning/operational" test does not necessarily turn upon the status or rank of the actor. *Id.*, at 230, 723 P.2d at 774. *See also, Jones v. City of St. Maries*, 111 Idaho 733, 736, 727 P.2d 1161, 1164 (1986). Of course, greater rank or authority will most likely coincide with greater responsibility for planning or policy formation decisions; but even the acts of those with the highest rank may result in governmental liability if they are operational. Likewise, those with the least authority may, on occasion, make planning decisions which fall within the ambit of the discretionary function exception.

The court below attached great significance to the fact that the police officer had an opportunity to choose between two alternatives in determining what should be done with the Bergan vehicle. From this, the court concluded that the officer, in choosing to give the keys of the vehicle to the intoxicated passenger, had exercised discretion and, thus, that Garden City was immune from suit under the discretionary function exception. For the reasons stated below, we reverse.

Admittedly, the officer possessed authority "to remove or cause to be removed to the nearest garage or other place of safety" the Bergan vehicle. *See* I.C. § 49–692. Clearly then, the officer could have disposed of the vehicle in any number of ways. However, the discretionary function exception "does not include functions which involve *any* element of choice, judgment or ability to make responsible decisions; oth-

---

1. I.C. § 49–692 reads in part:
   "**49–692. Officers authorized to remove vehicles.**—
   "...
   "(3) Any police officer is hereby authorized to remove or cause to be removed to the nearest garage or other place of safety any vehicle found upon a highway when:
   "...

   "(b) The person or persons in charge of such vehicle are unable to provide for its custody or removal, or
   "(c) When the person driving or in control of such vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before a proper magistrate without unnecessary delay."

erwise every function would fall within the exception." *Sterling, supra,* 111 Idaho at 227, 723 P.2d at 771 (emphasis in original).

■ Determining the applicability of the discretionary function exception is a two-step process. First, one must examine the nature and quality of the challenged actions. *Id.,* at 230, 723 P.2d at 774. Routine, everyday matters not requiring evaluation of broad policy factors will more likely than not be "operational." Decisions and actions which involve a consideration of the financial, political, economic and social effects of a given plan or policy will generally be "planning" and fall within the discretionary function exception. *See, e.g., Julius Rothschild & Co. v. State,* 66 Hawaii 76, 655 P.2d 877, 880–81 (1982) (replacement of major bridge involved evaluation of broad policy factors and was thus within discretionary function exception).

Second, the policies underlying the discretionary function exception must be considered. The policies are twofold: (1) to permit those who govern to do so without being unduly inhibited in the performance of that function by the threat of liability for tortious conduct; and (2) to limit judicial re-examination of basic policy decisions properly entrusted to other branches of government. *Johnson v. State,* 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352, 358–60 (1968). The Alaska Supreme Court has aptly explained this latter policy:

"The courts will refrain from second-guessing the legislative and executive branches on issues of basic policy. Under our system of separation of powers, such decisions are vested in the politically responsive coordinate branches. Thus, in applying the test for discretionary function immunity ... we will 'isolate those decisions sufficiently sensitive so as to justify judicial abstention.'

"In addition, courts must not intrude into realms of policy exceeding their institutional competence. The judicial branch lacks the fact-finding ability of the legislature, and the special expertise of the executive departments.... [Courts] should not attempt to balance the detailed and competing elements of legislative or executive decisions." *Industrial Indem. Co. v. State,* 669 P.2d 561, 563 (Alaska 1983) (citations omitted). *See also, Julius Rothschild & Co., supra,* 655 P.2d at 881.

■ We turn now to the facts at hand and apply the foregoing two-step process. The activity in question, entrustment of the keys to a motor vehicle to an obviously intoxicated person, was performed by a police officer after a routine stop of a motor vehicle in Garden City. The officer's decision regarding the disposal of the vehicle is one that is undoubtedly made by other officers in the field all the time. It is an everyday matter. The decision is rooted in practicality, and does not require an evaluation of financial, political, economic and social effects. The activity appears to be "operational."

Next, we consider whether officers in the field will be unduly inhibited in disposing of vehicles by the threat of liability for using less than ordinary care. Not insignificantly, the legislature has provided that the defense of public employees shall be undertaken by the governmental entity if the challenged act or omission of the employee is within the course and scope of employment and does not involve malice or criminal intent. I.C. § 6–903(c). Also, when the act or omission is within the scope of employment and does not involve malice or criminal intent, the "governmental entity shall not be entitled to contribution or indemnification, or reimbursement for legal fees and expenses from its employee ...." I.C. § 6–903(d). Finally, there "shall be a rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment and without malice or criminal intent." I.C. § 6–903(e). These legislative provisions should alleviate any fears that officers might have of being held personally liable for removing a motor vehicle from the public highways to a place of safety pursuant to I.C. § 49–692. We do not believe police officers in the field will be unduly inhibited by the prospect that the governmental entity might eventually bear

the financial responsibility for compensating those who have been injured by the negligent acts of officers. "The need for compensation to citizens injured by the torts of government employees outweighs whatever slight effect vicarious government liability might have on law enforcement efforts." *Downs v. United States,* 522 F.2d 990, 998 (6th Cir.1975). *See also, Johnson, supra,* 447 P.2d at 358–60.

Last, we consider the policy against "plac[ing] the court in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government." *Id.,* 447 P.2d at 360. The instant case presents no such danger. It is true that police officers, as part of the executive branch, are entrusted with the enforcement of the laws of the state; but the officer's decision here, to give the car keys to the passenger, was not a basic policy decision. Providing the plaintiffs here with a forum in which to seek redress for their injuries will not result in judicial second-guessing of policies promulgated by other coordinate branches of government and will not involve the courts with matters outside their institutional competence.

Accordingly, we hold that the actions of the officer in providing for the removal of a motor vehicle from the public highways did not fall within the discretionary function exception of I.C. § 6–904(1). Any reading of *Gordon v. Noble,* 109 Idaho 1048, 712 P.2d 749 (Ct.App.1986), a pre-*Sterling* case, to the contrary is hereby rejected. The decision of the trial court granting summary judgment to Garden City is reversed.

Since the discretionary function exception does not apply, Garden City will be liable if the acts of the officer, though authorized by statute, were performed without ordinary care. I.C. §§ 6–903(a) and 6–904(1). Ordinary care presupposes the existence of a legal duty. Liability may only attach "where [Garden City] if a private person or entity would be liable for money damages under the laws of the state of Idaho." I.C. § 6–903(a). We consider now the question whether the officer, if he

were a private person, may have breached a duty of ordinary care under the facts of the case at bar.

Plaintiffs' claim against Garden City is predicated upon negligent entrustment of an automobile. *See Kinney v. Smith,* 95 Idaho 328, 331 n. 1, 508 P.2d 1234, 1237 n. 1 (1973) (tort of negligent entrustment recognized).

"The 'negligent entrustment' tort approved in *Kinney* is a recognition of the risk of injury which exists when two ingredients are combined[:] the automobile and an incompetent or incapacitated driver. In *Kinney,* we said that a party may be liable for providing an intoxicated individual with an automobile." *Alegria v. Payonk,* 101 Idaho 617, 620, 619 P.2d 135, 138 (1980).

In *Alegria, supra,* we held that liquor vendors who knowingly dispense alcoholic beverages to obviously intoxicated minors may be liable for injuries proximately caused by their conduct. *Id.* We recognized a general duty of care: "[O]ne owes the duty to every person in our society to use reasonable care to avoid injury to the other person *in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in such injury." Id.,* at 619, 619 P.2d at 137 (emphasis in original), *quoting from Kirby v. Sonville,* 286 Or. 339, 594 P.2d 818, 821 (1979).

The tort of negligent entrustment is described in the Restatement (Second) of Torts, § 308 (1965):

"Permitting Improper Persons to Use Things or Engage in Activities.

"It is negligence to permit a third person to use a thing or engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends *or is likely to use the thing* or to conduct himself in the activity *in such a manner as to create an unreasonable risk of harm to others."* (Emphasis added.)

The comments explain that the rule is most frequently applied "where the person is a member of a class which is notoriously likely to misuse the thing which the actor

permits him to use." Restatement (Second) of Torts § 308 comment b (1965). The rule may also apply "if the third person's known character or the peculiar circumstances of the case are such as to give the actor good reason to believe that the third person may misuse it." *Id. See also,* Restatement (Second) of Torts § 308 illustration 2 (1965) ("A lends his car to B, whom he knows to be intoxicated. B's intoxicated condition leads him to cause harm to C. A is negligent toward C.").

The most common factual scenarios to which the negligent entrustment rule is applied are those where a loaded firearm is entrusted to a minor or where an automobile is entrusted to an obviously intoxicated person. Garden City argues that the rule is inapposite because the police officer here did not "own or control" the vehicle in question, or because there was no "entrustment" since the third party operated the vehicle despite instructions from the officer to the contrary.

■ Garden City's first argument is untenable. The officer seized control of the vehicle when he arrested its driver and retained the keys. As discussed earlier, he possessed statutory authority to dispose of the vehicle. If the driver or the passenger had requested the keys, the officer was not bound to comply. He was not a bailee as was the defendant in *Mills v. Continental Parking Corporation,* 86 Nev. 724, 475 P.2d 673 (1970), who was duty bound to surrender a vehicle to its bailor. When Bergan was arrested, the officer was the only person who had control over Bergan's vehicle. It is the legal right to "control" the thing entrusted which gives rise to the duty in negligent entrustment cases, Restatement (Second) of Torts, § 308 (1965), and this right to "control" is not limited to those who hold absolute title. Here, the officer had a right to "control" the vehicle by virtue of I.C. § 49-692(3).

Garden City also asserts that, *as a matter of law,* the giving of keys to an automobile to an obviously intoxicated person when coupled with an instruction not to drive the vehicle is not an "entrustment." We are not persuaded.

■ In cases involving entrustment of firearms, a plaintiff need not show that the defendant physically placed a firearm in the hands of a child. It is enough if the facts show that the defendant in exercising control over a firearm, acted in such a manner that it became likely a child would come into possession of it and use it in such a manner as to create an unreasonable risk of harm to others. *See Teter v. Clemens,* 131 Ill.App.3d 434, 86 Ill.Dec. 684, 687–88, 475 N.E.2d 1063, 1066–67 (1985) (*"Prima facie* negligence is established by showing that defendant permitted an inexperienced or irresponsible infant to have a dangerous gun or that he left such a gun where he should have foreseen it would come into the hands of such a child."), *aff'd in part, rev'd in part,* 112 Ill.2d 252, 97 Ill.Dec. 467, 492 N.E.2d 1340 (Ill.1986) (complaint failed to allege sufficient facts); *Kuhns v. Brugger,* 390 Pa. 331, 135 A.2d 395 (1957) (defendant had duty to keep firearm away from his young grandchildren and breached such duty by storing firearm in unlocked dresser drawer in an unlocked bedroom where he knew the children played).

The cases illustrate that the negligent entrustment rule is nothing more than a particularized application of general tort principles. *See Hartford Acc. & Indem. Co. v. Abdallah,* 94 Cal.App.3d 81, 90–92, 156 Cal.Rptr. 254, 260 (Ct.App.1979) (The rule "is more properly resolved by general principles of negligence.").

"The duty to take precautions against the negligence of others thus involves merely the usual process of multiplying the probability that such negligence will occur by the magnitude of the harm likely to result if it does, and weighing the result against the burden upon the defendant of exercising such care. *The duty arises, in other words, only where a reasonable person would recognize the existence of an unreasonable risk of harm to others through the intervention of such negligence. It becomes most obvious when the actor has reason to know that he is dealing with persons whose characteristics make it especially likely that they will do unreasonable*

*things.* The actor may be required to guard an insane patient to prevent him from jumping from the hospital window, or to refrain from putting an intoxicated person off of a train into a railroad yard, or letting him have an automobile, or more liquor." Prosser and Keeton, The Law of Torts § 33, at 199 (5th ed. 1984) (footnotes omitted) (emphasis added).

■ Where a person has a right to control a vehicle, he must exercise ordinary care and not permit another to use it in circumstances where he knows or should foreseeably know that such use may create an unreasonable risk of harm to others. *See Denby v. Davis,* 212 Va. 836, 188 S.E.2d 226 (1972) (car owner may be liable where, through "a pattern of conduct from which permissive use may be implied," he allows an unlicensed individual with impaired vision to use his vehicle); *Hartford Acc. & Indem. Co., supra,* (used car dealer may be liable for entrusting vehicle to unlicensed driver). This duty applies to police officers as well. They may be held liable

"for acts of affirmative negligence, for which anyone—police or civilian—would be liable: negligent handling of an attack dog, negligent operation of a motor vehicle, and negligent use of a firearm. Those acts of ordinary negligence do not change in character because they happen to have been committed by a police officer in the course of his duties.... A person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people, but neither does he assume any greater obligation to others individually." *Warren v. District of Columbia,* 444 A.2d 1, 7–8 (D.C.1981).

In addition, like *Snyder v. City of Rochester,* 124 A.D.2d 1019, 508 N.Y.S.2d 863 (1986), the instant case "is not a police protection case. Plaintiff[s] claim[ ] essentially that the police negligently entrusted the vehicle ... and that this negligence was a proximate cause of [their] accident and injuries. Liability may be imposed upon a municipality where such voluntary acts are a substantial factor in causing the accident and the occurrence of an accident

was reasonably foreseeable [citations]." *Id.,* at 864.

■ We have held that the discretionary function exception, I.C. § 6–904(1), does not shield the city from the negligence, if any, of the police officer here. Private persons may be liable for negligent entrustment under the laws of this state. Thus, I.C. § 6–903(a) has been satisfied. We have determined that the officer owed plaintiffs a duty, which is a question of law. Prosser & Keeton, The Law of Torts, § 37, at 236 (5th ed. 1984). The duty is to act reasonably in the face of a foreseeable risk of harm to others, not to always be right. The duty is not a special duty, applicable only to police officers: rather, it is a general duty which applies across the board to all members of society. It remains for the trier of fact to determine whether the duty was breached and, if so, whether the breach proximately caused injury to the plaintiffs.

Reversed and remanded for further proceedings not inconsistent with this opinion.

Costs to appellant.

BISTLINE and HUNTLEY, JJ., concur.

BISTLINE, Justice, specially concurring.

Because some of the assertions of Chief Justice Shepard and Justice Bakes might otherwise cause concern in the minds of some trial judges and attorneys, it seems appropriate that what I find in my independent research should be made available. Frankly, however, oral argument in this case, together with the briefing and the appeal record, left me with the initial thought that here was a tort claims case where the court would be unanimous. True, as Chief Justice Shepard has now pointed out, we were provided with "no authority of any other jurisdiction in a factual context similar to the case at bar." True, as he goes on to mention, most cases of negligent entrustment have dealt with the owner's liability, as in *Kinney v. Smith,* 94 Idaho 328, 508 P.2d 1234 (1973), which he cites. My own thought was that there might be no abundance of authority dealing with the liability of police officers

and their employers simply because common sense told me that no one would in good faith contend that a reasoning police officer would return the keys of a motor vehicle back to an arrested drunk driver or turn the keys over to an unarrested drunk passenger or drunk friend of the arrested drunk driver. Especially did I so believe in these three or four years last past when the public and the police have been extremely jealous in the area of public safety on the highways.

Justice Shepard, although he does not discuss the case, has suggested that we see the Florida case of *Everton v. Willard,* 468 So.2d 936 (Fla.1985), which he apparently believes stands for his statement that "there is no showing of any special relationship between the officers and the victim, and hence, there can exist no 'duty.'" With the opinion of the Florida court before me, I would venture to say that it is much doubted that that decision would evoke favorable comment from five out of any one hundred ordinary citizens of Idaho, and that is a generous assessment on my part. The gist of the Florida court's holding is well summed up by one headnote, which is:

> Deputy sheriff's decision not to arrest motorist on intoxicated driving charge but instead to merely issue citation and permit motorist to drive on, with effect that motorist was involved in fatal automobile accident 15 minutes later, was judgmental or discretionary, not ministerial, governmental function immune from suit by the innocent third parties as against subject deputy, county sheriff's department, and county. *Everton, supra,* 468 So.2d at 936–37.

The irony of that case is found in the court's recitation of a tragedy that should not have occurred:

> The tragic circumstances of this case are as follows. A Pinellas County sheriff's deputy stopped the respondent, Willard, for a traffic violation. The deputy recognized, from his own observations and Willard's admission, that Willard had been drinking to some extent. The deputy did not, however, charge Willard with an intoxicated driving offense. Rather,

he issued Willard a traffic citation for making an improper U-turn and permitted him to drive on. Approximately fifteen minutes later, Willard was involved in a collision in which one person was killed and another was severely injured. *Id.* at 937.

If the Supreme Court of Florida declares that it is permissible for a police officer to let loose an observably drunk driver on its highways, let the people of that state and all states be informed, and act accordingly.

The rationale for that remarkable opinion is a ridiculous comparison to the judicial discretion vested in judges and prosecutors:

> In our opinion, there is no distinction between the immunity afforded the police officer in making a determination of whether to arrest an individual for an offense and the discretionary decision of the prosecutor of whether to prosecute an individual or the judge's decision of whether to release an individual on bail or place him on probation. All of these decisions are basic discretionary, judgmental decisions that are inherent in enforcing laws of the state, not ministerial acts ... [which can give rise to tort liability]. *Id.* at 939.

Now, I must concede that there may be cases where a judge has decided not to require bail of a drunk defendant who has been brought before him, but I do not know of them, and especially doubt that in this state there are any magistrates who will release a drunk defendant even if he can post bail. Nor can I readily believe that there is any prosecutor in Idaho who, on chancing to be in the courthouse or at the jailhouse when a drunk driver is brought in, will make the decision that he will not prosecute. What the Florida court has done is to make an asinine comparison, apples to oranges. A prosecutor's considered decision not to prosecute for lack of evidence is entirely reasonable. A judge's decision to not require bail of a sober and penitent defendant who was arrested and incarcerated on a charge of drunk driving is entirely reasonable. In neither case is that decision turning loose on on the highway a "loaded gun." Whatever the statu-

tory law may be in Florida (and not our concern), it has always been the law in Idaho that a sheriff is under a duty to "arrest and take before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense ...," as well as specifically to "work concurrently and cooperate in his county, with the Idaho State Police in the following respects: (a) Require all persons using the highways in the state to do so carefully, safely and with exercise of care for the persons, property and safety of others...." I.C. § 31–2202.

Enough of the Florida majority opinion—which essentially was no more explanative of its *ratio decidendi* than the headnotes. Take note, too, that only a year earlier another appellate court in Florida had held otherwise, *Huhn v. Dixie Insurance Co.*, 453 So.2d 70 (Fla.1984), wherein it was:

determined that a city could be held liable in tort for a police officer's failure to arrest and detain an intoxicated driver when that driver subsequently injures a third party. The *Huhn* court held that the arrest decision did not involve the exercise of a discretionary governmental function that is immune from tort liability and found the officer and the governmental entity that employed him liable for this conduct. *Everton, supra,* 468 So.2d at 938.

Take note also of the two dissenting opinions in the *Everton* case. Justice Erlich is found, at first blush, to have entertained the same views as mine in our case:

I cannot agree that a police officer who, after stopping a dangerous driver and having "reason to believe that [the] person's ability to operate a motor vehicle is impaired by alcohol," releases the driver to *continue* an on-going violation of the law and so to massacre and mutilate innocent citizens of the state has performed the sort of policy-making function this Court immunized from tort liability in *Commercial Carrier.* This case does not merely deal with that indeed "discretionary exercise of police power authority" involved when a police officer decides whether or not to stop one particular motorist among the myri-

ad drivers and in the face of developing situations. That is, in fact, an allocation-of-resources strategy decision similar to that discussed in *Wong v. City of Miami,* 237 So.2d 132 (Fla.1970), cited with approval in *Commercial Carrier.* It cannot be fairly argued that the police officer who returned Marion Willard to the driver's seat of that vehicle was making a strategic decision about the deployment of law enforcement resources. That decision was made when he stopped Willard and discovered his inebriation.

The majority misperceives the issue in this case by saying that it "concerns a law enforcement officer's discretionary policy power authority to make or not make an arrest and whether a decision not to take an individual into custody constitutes a basic judgmental or decision-making function that is immune from tort liability." Willard was intoxicated, according to the allegations of the amended complaint. To arrest or not to arrest was not the decision facing the police officer. *The legislature has long ago determined that an intoxicated driver is a menace to the safety of others and must be removed from the road. That policy decision has resulted in the enactment of legislation designed to achieve that end. How that policy decision is carried out is a ministerial act of the police officer.* Arrest is one alternative. Another alternative is provided in section 396.072 which provides that intoxicated persons shall be taken into protective custody. A further alternative is section 856.011 which provides yet another means for getting a drunk off the highway. Letting the drunk stay on the road is not an alternative, and permitting him to continue driving violates the letter and the spirit of the statutes.

. . . .

*The tragic results of the officer's breach of duty were not merely foreseeable, they were highly predictable.* It would be *sheer sophistry to argue that the victims were not in the class the statute was designed to protect* or that

the harm was not precisely that which the statute was intended to prevent. The police officer was without the governmental authority to abet the violation of the law and to thus set into motion the events leading to this senseless tragedy. *Everton, supra,* 468 So.2d at 939–40 (footnote omitted) (emphasis added).

Justice Shaw wrote a comprehensive opinion which was more informative than the Florida majority opinion which cutely said nothing more of the driver's conduct than that he was stopped for a traffic violation:

Approximately ten to twenty minutes prior to the homicide, Deputy Parker had observed Willard making an *illegal U-turn at a dangerous intersection, against the red light and over a concrete median.* After observing *a second U-turn,* Deputy Parker detained Willard and observed that he staggered when he exited his car, smelled of alcohol, and admitted that he had been drinking. A friend of Willard's arrived during the detention and offered to drive him home, but Deputy Parker successfully discouraged the offer. *Instead, Deputy Parker issued a traffic citation for an illegal U-turn and released Willard to drive away in an intoxicated state.* Deputy Parker knew, or should have known, that Willard was incapable of driving because of intoxication and posed a public hazard if permitted to drive. Deputy Parker admitted to the investigating officer at the homicide scene that he knew Willard was intoxicated when he earlier released him. *Id.* at 941 (emphasis added).

Having thus exposed that facet of the majority opinion, Justice Shaw turned to the larger issue of sovereign immunity and observed as to the *seven opinions*[1] the court issued that day:

The series of decisions we issue today reflects the near total nullification of the legislative waiver of sovereign immunity. After today a plaintiff suing a govern-

ment tortfeasor will have to overcome a formidable series of hurdles which effectively restore full sovereign immunity to the state and its political subdivisions.... Given the sweep of discretionary activities and police power actions, I suggest that there is very little, if anything, left in the way of government action on which a tort victim could sue. In my view we have reached the point in our case law where we have only the most attenuated contact, if any, with the separation of powers doctrine on which *Commercial Carrier* rests and no contact at all with *the statutory determination that government entities will be liable for their torts if a private person would under like circumstances be liable.* Without comment, the majority opinion goes full circle and adopts the dissent to *Commercial Carrier* which maintained the view that the only government activities subject to suit were those which private individuals engaged in. This, of course, is simply a variation on the distinction between governmental and proprietary functions which we also rejected.[2] *Everton, supra,* 468 So.2d 942 (footnote omitted) (emphasis added).

Suffice it to say that the opinion is a virtual treatise on the sad state of sovereign immunity in Florida. The interested reader will find Justice Shaw in tune with our 4–1 majority opinion in *Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755 (1986), to which Justice Bakes dissented, and concerning which Chief Justice Shepard today concedes that he "disagrees with much of what is said [therein]." Clearly, Chief Justice Shepard and Justice Bakes are faithful to their convictions in citing the *Everton* case. Just as clearly, neither would agree with the horse-sense analysis of Justice Shaw of the circumstances which confronted the police officer in *Everton:*

1. Those cases are: *Duvall v. City of Cape Coral,* 468 So.2d 961 (Fla.1985); *Trianon Park Condominium Ass'n v. City of Hialeah,* 468 So.2d 912 (Fla.1985); *Rodriguez v. City of Cape Coral,* 468 So.2d 963 (Fla.1985); *City of Daytona Beach v. Palmer,* 469 So.2d 121 (Fla.1985); *City of Dayto-*

na *Beach v. Huhn,* 468 So.2d 963 (Fla.1985); *Carter v. City of Stuart,* 468 So.2d 969 (Fla. 1985); and *Reddish v. Smith,* 468 So.2d 929 (Fla.1985).

2. *Commercial Carrier Corp. v. Indian River County,* 371 So.2d 1010 (Fla.1979).

Assuming as we must in the posture of the case, that Willard was intoxicated, the deputy sheriff was faced with the purely ministerial alternatives of taking custody of Willard by an arrest or, with appropriate instructions and safeguards, placing him the custody of a responsible person, such as a friend, family member, or commercial taxicab driver who could provide safe transportation and prevent injury to others. The viable alternatives did not include leaving Willard behind the wheel of his vehicle where he posed an imminent threat to the public.

*The decision as to whether a police officer may release an intoxicated driver to continue motoring on his way has been taken at the highest policy level.* § 316.193, Fla.Stat. (1977). *The legislature has decided that driving while intoxicated is a hazard to the public safety. Once an intoxicated driver is apprehended, the obvious intent of the legislature is first to immediately remove the intoxicated driver from the highway* where he poses an imminent danger to the public safety and, second, to bring him into the legal system where any future threat he may pose to the public safety may be dealt with. It should be noted also that a private person in like circumstances would be liable under Restatement (Second) of Torts section 319 (1965):

> Duty of Those in Charge of Person Having Dangerous Propensities—One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

I emphasize that *my view is not based on the general duty of police officers to attempt to apprehend intoxicated drivers. The police here actually apprehended an intoxicated driver. They thereby created a specific legal duty not to release a dangerous individual on to*

*the public streets, which society and this Court should recognize. . . .*

As noted above, *unlike Florida law, the federal waiver of sovereign immunity contains an explicit exemption from suit for discretionary functions.*[3] Thus, federal law should logically be more receptive than Florida law to the argument that discretionary decisions of police officers are exempted from suit. It is noteworthy that the court in *Downs v. United States*, 522 F.2d 990 (6th Cir. 1975), rejected this proposition under circumstances where an FBI agent in charge was faced with extremely difficult decisions as to how to cope with an aircraft hijacking. The court held that the agent's activities did not entail the formulation of governmental policy and did not fall within the discretionary function exception. Thus, in the court's view, it was proper to scrutinize the day-to-day activities of law enforcement officers for purposes of determining governmental tort liability. *Similarly, although California statutorily excepts discretionary governmental activity, cases from that state have found there is no discretionary immunity under circumstances where a police officer apprehends a driver for traffic offenses. See Green v. City of Livermore*, 117 Cal.App.3d 82, 172 Cal.Rptr. 461 (1981). *Everton, supra*, 468 So.2d at 947–48 (footnotes omitted) (emphasis added).

The *Everton* majority opinion conceded that at least two jurisdictions had expressed a contrary view, and, although it provided citations, *Ryan v. State*, 134 Ariz. 308, 656 P.2d 597 (1982); *Irwin v. Town of Ware*, 392 Mass. 745, 467 N.E.2d 1292 (1984), nothing was said by way of analysis or criticism of those cases. However, Justice Shaw discussed *Town of Ware* as follows:

A recent case from Massachusetts is extremely relevant. In *Irwin v. Town of Ware*, 392 Mass. 745, 467 N.E.2d 1292 (1984), the court faced the issue:

---

**3.** Unlike Florida law, Idaho's Tort Claims Act *is* patterned after the federal legislation, and does

contain an exemption from suit for discretionary functions.

Is the decision of a police officer to remove from the roadways a driver who he knows or has reason to know is intoxicated a discretionary act within the meaning of G.L.C. 258, § 10(b). *Id.* Factually, *Town of Ware* is directly on point. The police apprehended an intoxicated driver and released him to drive away. Subsequently, the intoxicated driver collided head-on with another vehicle. Fatalities and injuries occurred. Massachusetts law, like Florida law, provides in pertinent part that government entities will be liable for tortious acts of public employees acting within the scope of their employment "in the same manner and to the same extent as a private individual under like circumstances." *Id.* Unlike section 768.28, however, the Massachusetts legislation exempts discretionary functions or duties from the waiver of immunity, and Massachusetts courts are under a legislative mandate to bar suits on discretionary activities. Perceptively, the court first recognized that the question of whether immunity existed on the basis of discretion was a separate threshold question from whether there was negligence and that "immunity for discretionary functions did not extend to all requiring judgment because 'the performance of all functions involves the exercise of discretion and judgment of some degree.'" *Id.* The court concluded in a passage which is directly on point here:

> No reasonable basis exists for arguing that a police officer is making a policy or planning judgment in deciding whether to remove from the roadways a driver who he knows is intoxicated. Rather, *the policy and planning decision to remove such drivers has already been made by the Legislature.*

*Id.* 467 N.E.2d at 1299. The court then went on to discuss the question of duty under tort principles which was treated as independent of immunity. Without, of course, describing it as the *Modlin* doctrine, the court analyzed the public (general) duty—special duty principle. The court recognized that, arguably, the principle that violation of a public (general) duty

does not create liability could be used to reintroduce general immunity under tort principles for government entities. The court avoided this result by applying the principle that a general duty does not preclude a special duty; the plaintiff must be permitted to show more—that there is a special duty. *The court then concluded that Massachusetts states had established that there was a special duty or relationship between police who apprehended intoxicated drivers and potential plaintiffs who are harmed by release of the intoxicated driver. Everton, supra,* 468 So.2d 948 (emphasis added).

Justice Shaw went on to deliver a telling blow in commenting on the lack of a discretionary exception in the Florida Tort Claims Act:

> The conflict between the approaches by federal, California, and Massachusetts courts, on the one hand, and this Court, on the other, is striking. *The former courts are statutorily mandated to recognize an exception for discretionary functions, yet they interpret discretion narrowly and obtain results which are legally defensible.* By contrast, we have no mandate to exempt discretionary functions, yet *we judicially create such an exemption and read it so broadly as to be indefensible on any discernible grounds. Id.* at 948 (emphasis added).

He followed with an excellent rebuttal to Chief Justice Shepard's charge that the majority today "creates yet another new cause of action under the aegis of the Tort Claims Act, which is *merely second-guessing* of an on-the-scene decision by law enforcement officers":

> *It is urged that judges and juries, in the later tranquility of the courtroom, cannot be permitted to "second guess" the decisions of police officers* made under the stress and strain of the "street world" with its conflicting demands and dangers. I appreciate the difficulties faced by police officers, but the very demands and dangers faced by these officers and the speed with which they must act is itself an argument for examining these actions in the later tranquility

of a court. The purpose of the examination is to do justice to the purported tort victim and to bring problems to the attention of the government and public; it is not to discipline, punish or even criticize the police officers' conduct. It is inevitable under the circumstances of police work, indeed of any work, that tortious errors will be made. These errors will not necessarily result from bad faith, malice, or wanton and wilful conduct by the police officer. Except for those instances where the police officer is alleged to have so acted, the officer is statutorily exempted from any liability or even from suit under section 768.28(9)(a), as amended in 1980. *This is constitutionally permissible so long as the alternative remedy of suing the government is available.* Further, judges and juries routinely examine or "second guess" the actions of police officers in order to protect the constitutional rights of accused persons without any suggestion or fear that this violates the separation of powers doctrine. I can see no reason why courts should not hear justiciable tort suits in order to protect the constitutional right of tort victims to access to the courts for redress of wrongs by governmental entities and their employees. Indeed, in my view, we have the constitutional duty to do so. *Everton, supra*, 468 So.2d at 949 (footnote omitted) (emphasis added).

Chief Justice Shepard has expressed the concern that holding the governmental entity liable for a tortious act of its officer employees will have an adverse or chilling effect upon law enforcement officers, *i.e.*, in his language, "To place upon law enforcement officers a 'duty' to always be right in their on-the-spot street decisions, and then hold their employees liable when such a decision goes awry, continues the erosion of confidence of law enforcement officers in our system of justice." With all due respect, this assertion is farfetched and not in contact with reality. Our concern here is not that an officer must "always be right," but whether there may be circumstances where the officer's active (not passive) conduct has been tortious, and

as a result of that conduct innocent parties have suffered serious and grievous injuries. Nothing in our majority opinion mandates that police officers "must always be right," but rather, it deals with a specific wrong.

Again, it is in order to turn to the language of Justice Shaw for an eloquent rebuttal to Chief Justice Shepard's opinion:

Respondents and amici urge that denying immunity for the discretionary acts of police officers will "chill" the officers in the performance of their duties. I do not believe there will be any unwholesome chilling of police officer conduct. My view is consistent with the *Downs* court's rejection of the "chilling effect" argument:

The prospect of governmental liability for the actions of law enforcement officers should not cause those officers less vigorously to enforce the law. The need for compensation to citizens injured by the torts of government employees outweighs whatever slight effect vicarious government liability might have on law enforcement efforts.

*Downs v. United States*, 522 F.2d at 998. As noted above, barring misconduct, there is no individual liability for such torts. The legislature has withdrawn the right for a cause of action against the public employee, except as specified, but allows redress for the tort by granting a cause of action against the governmental entity. It is the governmental entity which is being denied immunity. The choice is whether the tort victim should bear the full cost of the injuries or whether society at large, through its government, should bear the cost of torts committed in the scope of governmental activities. The choice has already been made by the legislature in accordance with article X, section 13, Florida Constitution, and we have no authority to overrule that decision. *Everton, supra*, 468 So.2d at 949 (footnote omitted).

My understanding of the Idaho Tort Claims Act is that the scenario which we

review fits exactly into the foregoing discussion. Moreover, it is very, very much to be doubted that there are to be found any police officers in Idaho who would sanction the conduct here in question. Police officers are also fathers, brothers, mothers, sisters, aunts, uncles, grandparents and grandchildren who do not care to have themselves or some member of the family killed or maimed by a drunk who because of another officer's conduct allowing a drunk to become a drunk driver who would travel the wrong way on a main, well-marked, one-way thoroughfare. There is here, as within the purview of our statutes and Justice Shaw's comments, *no* suggestion that that conduct of the officer was conceived of a malicious or criminal contempt. Probably the opposite is true. The officer in all likelihood was being nice, but the fact is that, unless a jury says so, it is not reasonable conduct for anyone to entrust the keys of a vehicle to a person observably drunk, and who in fact and contrary to Chief Justice Shepard's view, could have been arrested, providing I am not grossly in error in my reading of I.C. § 23–604—an available although seldom used statute. It certainly would have been properly invoked here had Mr. Bergan, the arrested driver, handed the keys over to the passenger Mr. Inama, and had Inama declined the officer's request for those keys. The kindness of Officer Bergan reminds one of the kindness of Officer Green who stopped a speeding vehicle, concluded that its driver was intoxicated, arrested him and placed him, hand-cuffed, in the rear of the police car. On the driver's complaint that the cuffs were painful, and because he had been cooperative and appeared "all but incapacitated by intoxication," the officer removed the cuffs. The officer went to help another officer move the driver's car to a place of safety. While so doing, the drunk driver jumped in the driver's seat of the police car and sped off. Hot pursuit then ensued at speeds up to 65 miles per hour. Struck by the drunk driver operating the police car was Ed Duarte, while in the process of innocently mowing the lawn in his front yard. *Duarte v. City of San Jose,* 100 Cal.App.3d

648, 161 Cal.Rptr. 140 (1980) (hearing by the Supreme Court of California denied).

The dissenters to our majority opinion are not receptive to its views and conclusions because it "offers no authority of any other jurisdiction in a factual context similar to the case at bar," and because "there is no showing of any special relationship between the officers and the victim, and hence there can exist no 'duty.'"

The dissenters are apparently not as impressed as am I with notions of *foreseeability*. This difference has surfaced in other cases, notably and recently, *Johnson v. Sunshine Mining Co.,* 106 Idaho 866, 684 P.2d 268 (1984). Foreseeability of the result of certain conduct, be it active or passive, misfeasance or nonfeasance, where a duty exists is actionably tortious. Here there should be no doubt that Officer Bergan, having stopped Bergan, and arrested him, and having removed and parked his car, and pocketed the keys, was under a duty to the public, that public in general who might be using the public highways, including pedestrians on the crosswalks, and those in their yards mowing their lawns, or turning on a one-way thoroughfare to go west on Chinden. *Duarte* was such a case:

The only remaining question, therefore, is whether an officer also has a legal duty to third persons, such as appellant, to exercise due care in operating a police vehicle in order to protect against injuries caused by the negligent driving of someone who steals that vehicle. The question of whether a legal duty exists is a question of law. (*Harris v. De La Chapelle* (1976) 55 Cal.App.3d 644, 647, 127 Cal.Rptr. 95.) A duty to protect third persons from unreasonable risk of injury may include a duty to protect against the misconduct of another individual. " 'If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.' [Cita-

tions.]" (*Richardson v. Ham* (1955) 44 Cal.2d 772, 777, 285 P.2d 269, 272.)

· *To decide whether a legal duty existed here, we must consider "the foreseeability of harm to the plaintiff,* the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalance of insurance for the risk involved." (*Reenders v. City of Ontario* (1977) 68 Cal.App.3d 1045, 1053, 137 Cal.Rptr. 736, 741–42, citing *Rowland v. Christian* (1968) 69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 443 P.2d 561.)

Plaintiff's injury is undisputed. *Although the foreseeability of harm from a drunk driver to plaintiff, a man mowing his lawn,* was less than that to a person driving in another vehicle or walking across the street, nevertheless *it is reasonably foreseeable that an intoxicated person fleeing in a stolen police car might run that car off the road onto a sidewalk or into someone's yard.* In addition, the connection between the officer's conduct in leaving Villalovos unattended in the car and the appellant's injury is difficult to dispute. The reasonable likelihood that an arrested drunk driver might, in his inebriated state of mind, try to flee is precisely the hazard that makes giving him easy access to a vehicle negligent. Furthermore, imposing a duty not to leave the motor running in an unattended police vehicle occupied by a possibly intoxicated person will not hamper law enforcement, and will have no result other than to reduce the likelihood of similar unfortunate and preventable incidents in the future. Consequently, we conclude that a police officer's duty to operate his police vehicle with due care encompasses a duty to third persons such as plaintiff not to leave that vehicle unattended, its motor running, under circumstances which invite theft and flight.

Due care as an element of negligence presents a question of fact for the jury. If circumstances permit a reasonable doubt whether a defendant's conduct violated the boundaries of .due care, the doubt must be resolved as an issue of fact by the jury rather than of law by the court. (*Brummett* [*v. County of Sacramento* ], *supra*, 21 Cal.3d [880] at p. 887, 148 Cal.Rptr. 361, 582 P.2d 952.) *Duarte, supra*, 161 Cal.Rptr. at 145–46 (emphasis added).

*Green v. City of Livermore*, 117 Cal. App.3d 82, 172 Cal.Rptr. 461 (1981), is perhaps the case which might convince the doubting dissenters as to the validity of our majority opinion. Its facts are simple and involve, as here, a drunk driver and a drunk passenger—in fact, two drunk passengers:

On August 11, 1977, several City police officers, acting in their official capacities as employees of the City, stopped a Ford automobile belonging to Jones and Hardgraves. All three occupants of the car, Jones, Hardgraves and Noble, were intoxicated. Hardgraves was driving the vehicle along public roads in the City. The officers arrested Hardgraves for drunk driving (Veh.Code, § 23102) and resisting arrest (Pen.Code, § 148) and took him into custody. At the time of his arrest, Hardgraves did not have possession of the car keys. However, the officers did not arrest either Jones or Noble and left them with the Ford without disabling or impounding it. The officers also did not remove any keys from the Ford. Shortly thereafter, Noble drove the Ford, struck the Green automobile and seriously injured the plaintiffs and killed Marcelina. Noble did not have a valid driver's license. *Green, supra*, 172 Cal.Rptr. at 463.

The court's opinion needs no help from me and provides the dissenters with what they have asked for:

Preliminarily, we turn briefly to the third ground, i.e., whether the statutes provide complete immunity.

In *Mann v. State of California*, 70 Cal.App.3d 773, 139 Cal.Rptr. 82, the court rejected the immunity defense as to a police officer who stopped to investi-

gate a car stranded in a speed change lane of a busy freeway. After a tow truck arrived, the officer left the scene without advising any of the individuals involved. Moments later, an oncoming motorist struck one of the cars involved and some of the people standing around it. The court held, at pages 778–779, 139 Cal.Rptr. 82, that since the immunity statutes were designed only to prevent political decisions of policymaking officials from being second-guessed in personal injury litigation, section 845 did not provide immunity where the officer was negligent in the performance of his investigation. The court pointed out, at page 778, 139 Cal.Rptr. 82, that the officer's decision "regarding whether to investigate or not *may have been a discretionary decision ..., but once he decided to* investigate, any negligence on his part in his ministerial performance of the investigation *was clearly beyond the protection of the statutory discretionary immunity*" (emphasis added).

Similarly here, once the officers stopped the Ford, they assumed action on behalf of the public (*Quelvog v. City of Long Beach,* 6 Cal.App.3d 584, 86 Cal.Rptr. 127) and, therefore, were held "to the same standard of care as a private person or organization" (*Hartzler v. City of San Jose,* 46 Cal.App.3d 6, 10, 120 Cal.Rptr. 5). Furthermore, the reasoning of *Mann, supra,* 70 Cal.App.3d 773, 139 Cal.Rptr. 82, indicates, at pages 779–780, 139 Cal.Rptr. 82, that under current theories of liability sanctioned by the Restatement of Torts and other authorities, a public entity may be liable for the nonfeasance of its employees. The immunity defense was also rejected in *Clemente v. State of California,* 101 Cal.App.3d 374, 161 Cal.Rptr. 799. In *Clemente,* the same panel that decided *Mann, supra,* reiterated, 101 Cal.App.3d at pages 378–379, 161 Cal.Rptr. 799, its narrow interpretation of the immunity statutes "essentially only to protection against crime" and "from budgetary neglect."

Also in accord is the recent decision of this court (Division Three) in *Duarte v.*

*San Jose,* 100 Cal.App.3d 648, at pages 658–659, 161 Cal.Rptr. 140, which recognized that in situations such as the instant one, officers had a duty of care toward innocent third parties like the plaintiffs here. On the duty issue, we cannot distinguish the instant case from *Duarte* and *Clemente, supra,* and the other authorities discussed above. The officers had questioned each of the passengers as they ascertained that Nobel did not have a valid license, and had an opportunity to observe each one. Given the intoxicated state of Jones and Noble, there would be a question of fact as to whether, under the circumstances, it was reasonable for the officers not to take some steps, such as removing the keys to prevent its being driven by Noble (who had no valid license) or Jones. The instant allegations do not involve the discretion of the officers in deciding whether or not to investigate Ford, but instead, only their negligence in the conduct of the discretionary investigation. As in *Clemente, supra,* [101 Cal.App.3d] at page 379, 161 Cal. Rptr. 799, neither the discretionary immunity of section 820.2 nor the more specific discretionary immunity of failure to enforce a statute (§§ 821, 818.2) immunized the City from the legal consequences of the officers' negligence in failing to remove the keys from the vehicle. Thus, the trial court here erroneously sustained the City's demurrer on the grounds of the immunity provided by the statutes. *Green, supra,* 172 Cal. Rptr. at 463–464 (footnotes omitted).

Appropriately, so I hope, I close by responding to what my perception reads as the unspoken concern of the dissenters, again borrowing from Justice Shaw's *Everton* opinion:

[W]e have no authority to override the constitutional and statutory provisions authorizing access to the courts for bringing tort suits against the state. To paraphrase Justice Frankfurter in *Indian Towing Co. v. United States,* 350 U.S. 61, 67, 76 S.Ct. 122, 125, 100 L.Ed. 48 (1955), we are not the self-constituted guardians of the public purse empowered

to import sovereign immunity into a statute designed to waive it. The legislature is the primary guardian of the public purse and we have no authority to override its determination that the government will be liable for its torts. *Everton, supra,* 468 So.2d at 946.

SHEPARD, Chief Justice, dissenting.

Today's majority opinion suffers from a great many defects. However, the essence of my disagreement is that the Court today creates yet another new cause of action under the aegis of the Tort Claims Act, which is merely a second guessing of an on-the-scene decision by law enforcement officers. The Court confounds the duty of an owner of a motor vehicle with the "duty" of a law enforcement officer. The majority opinion, in my view, takes this Court into an area which insofar as the majority opinion is concerned is unsupported by any authority of any jurisdiction in the entire nation.

The majority opinion utilizes this Court's opinion in *Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755 (1986) as authority for much of the action taken by the majority today. I disagree with much of what is said in *Sterling,* however clearly that decision commands a majority of the members of this Court, represents the law of this state, and is unlikely to be overruled, at least in the near future. In defense of the majority opinion in *Sterling,* it should be pointed out that in the court below the case was decided by judgment on the pleadings. Therefore, the moving party admitted all the allegations of plaintiff's complaint. Therein Bloom, the nominal defendant, was serving a probation, a special condition of which was that for a year Bloom was not to drive a motor vehicle except for employment purposes. Plaintiff's complaint alleged (the truth of which was admitted) among other things, that probation authorities allowed Bloom to drive a motor vehicle for non-employment purposes, contrary to the order of probation, and allowed Bloom to operate an uninsured motor vehicle. Therefore it can be argued that *Sterling* in actuality is a relatively narrow case, and that the probation authorities had no discretion or authority to "allow" Bloom to operate a motor vehicle under those circumstances.

The facts of the instant case are, of course, substantially different from those of *Sterling.* The decision of the lower court was not based on the pleadings, but was rather based on a motion for summary judgment, supported by uncontroverted affidavits. There is nothing in the record to indicate that the law enforcement officers in question here in any way permitted, allowed, or entrusted the vehicle to Inama. Rather, the record is clear that the officers directed Inama not to drive the motor vehicle. There is no indication in the record that the officers had a "duty" to impound the vehicle. Rather, it is clear that they were vested with authority to make a decision. That decision was obviously made on the basis of Inama's promises not to drive the vehicle and to obtain other assistance. While it is now easy to second guess that decision of the officers in view of the resulting circumstances, I suggest that such is unfair to the officers, and establishes a "duty" previously unknown to the law. To place upon law enforcement officers a "duty" to always be right in their on-the-spot street scene decisions, and then hold their employers liable when such a decision goes awry, continues the erosion of confidence of law enforcement officers in our system of justice. In my view, such on-the-spot street scene decisions by law enforcement officers are the very essence of discretionary acts which the legislature determined should be exempt from liability. In my view, the actions of law enforcement officers in this case best illustrate the fallacy of attempting to determine what is "discretionary" by the use of an artificial operational-planning dichotomy.

The majority opinion utilizes the authority of *Kinney v. Smith,* 95 Idaho 328, 331, 508 P.2d 1234, 1237 (1973) as establishing the "tort of negligent entrustment." *Kinney,* which was also authored for the Court by Donaldson, J., was rather based on I.C. § 49-339: "No person shall authorize or knowingly permit a motor vehicle owned by him or under his control to be driven upon any highway by any person who is not

authorized hereunder or in violation of any of the provisions of this act." The Court there said:

> Among other things, the plaintiffs offered to prove that when the appellant furnished her car to the driver, she knew that his driver's license had been suspended. If the appellant knowingly permitted her car to be driven by a person whose license had been suspended, then she acted in violation of I.C. § 49–339.

Therefore, in my view *Kinney* has no application to the case at bar.

The majority opinion offers no authority of any other jurisdiction in a factual context similar to the case at bar. The cases cited therein relate to *owners* of vehicles knowingly entrusting vehicles to persons who are intoxicated or otherwise incompetent or prohibited by law from operating motor vehicles. The case of *Snyder v. City of Rochester*, 124 A.D.2d 1019, 508 N.Y.S.2d 863 (1986) is cited as authority for the proposition that a municipality may be held liable when a police officer negligently entrusts a vehicle to a third person. I do not view *Snyder* as so holding. Rather, in *Snyder* it is clear that plaintiff was injured in a one-car accident while driving her boyfriend's car. The court assumed the truth of Snyder's factual allegations which were that one of the city's police officers gave her the keys to the car and *directed* her to remove it from the scene or face arrest. Such, I suggest, is a far cry from the factual circumstances of the instant case.

The majority also cites *Warren v. Dist. of Columbia*, 444 A.2d 1 (D.C.App.1981) as support for the proposition that the officers in the instant case violated a "duty." I disagree, and in my view *Warren* stands for exactly the opposite of the proposition sought by the majority. The majority quotes one short sentence from *Warren*. The decision of the court in *Warren*, 444 A.2d at 4, was based on,

> [T]he fundamental principle that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen....

Accordingly, courts have without exception concluded that when a municipality or other governmental entity undertakes to furnish police services, it assumes a duty only to the public at large and not to individual members of the community.

The court in *Warren* cited with approval *Massengill v. Yuma County*, 104 Ariz. 518, 456 P.2d 376 (1969). Therein a complaint had been dismissed alleging that law enforcement officers were negligent in failing to apprehend or prevent the reckless driving of two people who collided with an on-coming vehicle causing the death of five persons. The Arizona court concluded that while there was a duty to the general public, there was no individualized duty to the deceased occupants of the on-coming vehicle.

As stated in *Williams v. State*, 24 Cal.3d 18, 192 Cal.Rptr. 233, 664 P.2d 137 (Cal. 1983):

> The allegations of negligence in the present case derived solely from defendants' status as police employees and from plaintiff's contention that defendants failed to do what reasonably prudent police employees would have done in similar circumstances. The difference is between ordinary negligence on the one hand and a novel sort of malpractice on the other. A person does not, by becoming a police officer, insulate him from any of the basic duties which everyone owes to other people. But neither does he assume any greater obligations to others individually. The only additional duty undertaken by accepting employment as a police officer is the duty owed to the public at large.

*See also Chambers-Castanes v. King County*, 100 Wash.2d 275, 669 P.2d 451 (1983); *Jacobson v. McMillan*, 64 Idaho 351, 132 P.2d 773 (1943); *Worden v. Witt*, 4 Idaho 404, 39 P. 1114 (1895).

In the instant case there is no showing of any special relationship between the officers and the victim, and hence there can exist no "duty." The officers did not arrest, and had no basis upon which to arrest Inama. To suggest that the officers in the instant case violated a duty for which liability should be imposed, flies in the face of all authority. *See Everton v. Willard*, 468

**220**

So.2d 936 (Fla.1985); *Dauffenbach v. City of Wichita,* 233 Kan. 1028, 667 P.2d 380 (1983); *Zavala v. Zinzer,* 123 Mich.App. 352, 333 N.W.2d 278 (1983); *Crouch v. Hall,* 406 N.E.2d 303 (Ind.App.1980); *Parker v. Sherman,* 456 S.W.2d 577 (Mo.1970); *Tomlinson v. Pierce,* 178 Cal.App.2d 112, 2 Cal.Rptr. 700 (1960). *See also* Annot. 46 A.L.R.2d 1084.

BAKES, Justice, dissenting:

I concur in Chief Justice Shepard's dissenting opinion. This case can be decided simply on the basis that the trial court did not err in granting summary judgment based upon the plaintiff's factual claim of negligent entrustment.

In *Kinney v. Smith,* 95 Idaho 328, 508 P.2d 1234 (1973), this Court unanimously held that if a person negligently entrusts his vehicle to one who he knows is intoxicated, he may be liable for injury caused by that person's operation of the entrusted vehicle. No member of the Court today questions the continued vitality and desirability of the rule laid down in *Kinney.* However, in the present case, the officer did not own the vehicle, nor did he entrust it to the passenger in the vehicle to drive. The record is uncontroverted that the officer specifically directed the passenger not to drive the vehicle. No one has questioned that fact. Accordingly, the negligent entrustment rule announced in *Kinney v. Smith, supra,* is inapplicable in this case and the trial court correctly granted summary judgment for the defendant.

The Court nevertheless imposes liability upon the City of Garden City, not because the officer negligently entrusted his own motor vehicle to an intoxicated person, but because the officer left the keys of the arrested person's vehicle with the passenger so that he could follow the officer's instructions and deliver the keys to the wife of the owner so that she could remove the vehicle to their place of residence. The keys did not belong to the officer, and having exercised the discretion given him under the statute not to impound the vehicle, the officer had no right to keep them. He was under some duty to see that the keys got to the wife of the rightful owner so that she could have the use of their motor vehicle.

Even though the officer specifically directed the passenger not to operate the motor vehicle, the majority holds that the City of Garden City may be liable because the officer did not eliminate all means of the passenger from operating the motor vehicle. Today's case goes far beyond anything which this Court approved in *Kinney v. Smith, supra.*

The potential ramifications of today's case go far beyond the field of automobiles. For example, if the police officer is now called to the home where a family dispute is in progress, does he dare leave the scene without first removing all dangerous weapons or other potentially dangerous objects at the risk of being held responsible for "negligently entrusting" those objects to one of the occupants who subsequently assaults or kills a member of the household with it? By what authority would he remove such objects?

Today's "negligent entrustment of keys" case may well be tomorrow's "negligent entrustment of a dangerous object" case. The potential for further expansion of liability is limitless. *Kinney v. Smith, supra,* does not support the expanded rule adopted by the Court today. Accordingly, I dissent.