853 P.2d 596

**CITY OF LEWISTON, a municipal corporation of the State of Idaho, Plaintiff–Respondent,**

v.

**Margaret LINDSEY, Defendant–Appellant.**

**and**

**Christine M. Neely, Sid Palmer, Jane Doe Palmer, Idaho First National Bank, L.C. Spurgeon, Defendants.**

No. 19542.

Court of Appeals of Idaho.

March 3, 1993.

852

Danny J. Radakovich, Lewiston, for defendant-appellant.

Don L. Roberts, Lewiston, for plaintiff-respondent.

SILAK, Acting Judge.

In order to obtain the right-of-way for a street improvement project, the City of Lewiston filed an eminent domain action to acquire real property owned by Margaret E. Lindsey. Lindsey counterclaimed alleging causes of action for negligence, inverse condemnation and breach of promise. With respect to the City's condemnation action, the parties later agreed that Lindsey be compensated $18,000 for the condemned property, and the trial proceeded solely on the issues raised in Lindsey's counterclaim. After the parties had presented their cases, but before the matter was submitted to the jury, the district court granted the City's motion for a directed verdict. Lindsey timely appealed, challenging the order directing a verdict in favor of the City.

## FACTS AND PROCEDURAL HISTORY

This case arose during the planning and development of a street improvement project in the City of Lewiston. On September 26, 1983, the city council of Lewiston passed a resolution declaring its intention to perform a federally funded street improvement project to be known as the seventeenth-eighteenth street project. The preliminary design phase of the project commenced on December 12, 1983, when the Idaho Department of Transportation (IDT) approved the project as proposed by the City and agreed to work with the City to qualify the project for federal funding. According to the project's preliminary design and right-of-way plans, a parcel of land owned by Lindsey was located within the project's proposed right-of-way, and therefore was projected for acquisition by the City. IDT approved the City's preliminary design and right-of-way plans on September 14, 1984, completing the preliminary design phase of the project and commencing the final design phase. It is undisputed that sometime during the final design phase—when the final plans were being prepared but before construction was commenced—the City was to acquire the private property needed for the project's right-of-way.

About three years after entering the final design phase, on August 31, 1987, the City commenced the process of acquiring Lindsey's property by having the property appraised. On September 28, 1987, about a month after the appraisal was completed, the City commenced negotiations with Lindsey by offering her $11,000 for the property. Lindsey rejected the City's offer and on August 31, 1988, following unsuccessful negotiations, the City filed an eminent domain action against Lindsey to have the amount of compensation determined judicially.

Lindsey subsequently filed a counterclaim against the City alleging that on February 12, 1985, the City advised her of its intention to acquire her property for approximately $40,000, and that she was further advised at that time that her daughter, who occupied the premises, would need to be relocated and the premises vacated. Lindsey further alleged that she promptly relocated her daughter and vacated the premises but that the City failed to move promptly to acquire the premises as the City represented; not making an offer of purchase to Lindsey until September of 1987, about two and one-half years later. Lindsey's claim was one for inverse condemnation, alleging that during those two and one-half years the City greatly impeded her use of the property, which interference constituted an unconstitutional taking of her property without compensation. Lindsey's counterclaim did not state any legal theory of recovery other than for inverse condemnation. However, by the time of trial, Lindsey had also asserted that her allegations supported an action for negligence against the City. Also by the time

of trial, the parties had stipulated that the City was condemning Lindsey's property for a proper public purpose, and that just compensation for Lindsey's property would be $18,000 plus interest from August 31, 1988, the date of the summons in the City's condemnation action. This stipulation resolved the issues raised by the City's condemnation action, leaving only Lindsey's counterclaims for inverse condemnation and negligence to be resolved at trial.

In support of her claims, Lindsey testified at trial that during December of 1984, John Block, a principal planner on the City's staff, represented to her that the City would acquire her property within the next thirty to sixty days and that the City would pay her approximately $40,000 for the property. Lindsey also introduced as evidence a letter sent to her by the City dated February 12, 1985, which stated as ·follows:

> In response to your request to receive the current status of property negotiations on the 18th Street Project, I would like to offer the following information.
>
> The additional private property required to construct the project has been identified. Your entire property at 1733 8th Avenue Boulevard including the structure will have to be acquired as part of the project in order to construct the street improvements. In order to begin right-of-way negotiations, the environmental assessment report must be approved. At this point, the environmental assessment report is under review by the appropriate state and federal agencies. Although predicting the date when approval will be given is difficult, our schedule requires that right-of-way negotiations commence within the next two months in order to have construction begin in the summer of 1986.

Lindsey testified that based on Block's oral statements in December of 1984, and the above-quoted letter of February 1985, she understood that she had thirty to sixty days to vacate the subject premises. Lindsey testified that in reliance on the City's representations, she went to a bank and secured a loan for about $40,000 to finance

the relocation of her daughter. Lindsey also testified that she intended to repay the loan with the money she believed the City was shortly going to pay her for the property. Finally, Lindsey testified that for two and one-half years following the City's letter of February 12, 1985, the City unreasonably delayed the acquisition of her property, and that during that time she contacted the City on numerous occasions to ascertain the status of the acquisition process and the City continuously represented to her that acquisition would take place in the near future, and therefore she should neither occupy nor improve the premises. Lindsey claimed that the City's failure to promptly acquire and compensate her for the property, at the same time it prohibited her from renting or improving the property, caused her the following damages: $14,440 in lost rent; $60,000 for the cost of relocating her daughter; $500,000 in late fees, collateral forfeitures, and lost business opportunities as a result of being unable to repay the bank loan; and $1,000,000 for pain and suffering, impaired health, and public humiliation.

To refute Lindsey's counterclaims, the City presented evidence at trial to show that neither Block nor any other city official ever told Lindsey that the City would acquire her property within thirty to sixty days, only that it desired and expected that negotiations would begin within that time period; that neither Block nor any other city official ever told Lindsey the City would pay her approximately $40,000 for the property; and that the City never advised Lindsey about what she could or could not do with her property nor interfered with or limited Lindsey's use of her property in any other way prior to the filing of its condemnation action in August of 1988. The City also argued that progress on the project was contingent on a variety of financial, political, social and economic factors, many of which the City could not control, but all of which were to be considered and resolved according to the discretion of the City. Accordingly, the City argued that progress on the project, and even the very existence of the project, was always a matter within the discretion

of the City, and therefore the City had no duty or other legal obligation to acquire Lindsey's property either within any certain time period or at all.

After the parties presented their cases, but before the matter was submitted to the jury, the district court granted the City's motion for a directed verdict with respect to Lindsey's counterclaim. The district court concluded that Lindsey's claim of negligence was unfounded as a matter of law on the grounds that: (1) the City had no duty to acquire Lindsey's property for public use either within a specified period of time, or at all; (2) there was no substantial evidence upon which the jury could have properly found that the damages alleged by Lindsey were caused by the City; (3) Lindsey failed to give the City timely notice of any cause of action sounding in tort, a mandatory condition precedent under the Idaho Tort Claims Act (ITCA) to bringing a tort action against the City; and (4) the City is immune from liability because the conduct alleged by Lindsey falls within the discretionary function exception of the ITCA.

With respect to Lindsey's inverse condemnation claim, the district court found that the only taking of Lindsey's property occurred on August 31, 1988, when the City commenced the eminent domain proceedings to condemn Lindsey's property for public use. The court determined that the City did nothing to interfere with Lindsey's use of her property prior to that time, and that Lindsey was given due process and just compensation for the taking of her property as a result of the City's condemnation action.

Lindsey now seeks review of the district court's order granting the City's motion for a directed verdict. For the following reasons, we affirm the verdict directed by the district court.

## ISSUES AND STANDARD OF REVIEW ON APPEAL

Lindsey's appeal requires us to resolve two issues: (1) whether the district court erred in concluding that, as a matter of law, her tort claim against the City was unfounded, and (2) whether the district court erred in concluding that, as a matter of law, Lindsey's claim for inverse condemnation was unfounded. Because the decision whether to grant a directed verdict is purely a question of law, we review that decision freely, applying the same standards which governed the trial court's ruling on the motion. *Quick v. Crane*, 111 Idaho 759, 764, 727 P.2d 1187, 1192 (1986). That standard is whether, viewing the evidence in the record in the light most favorable to the non-moving party, there is substantial evidence upon which the jury could have properly found in favor of the non-moving party. *Quick*, 111 Idaho at 763-64, 727 P.2d at 1191-92.

1. *Lindsey's Negligence Claim.*

As noted above, the district court articulated a number of grounds supporting its conclusion that Lindsey's tort claim was invalid as a matter of law. Because our conclusion—that the City is immune from liability for the conduct alleged by Lindsey under the discretionary function exception of the ITCA—is dispositive of Lindsey's negligence claim, we need not address the other grounds articulated below and argued on appeal.

With the enactment of the ITCA, the state of Idaho has subjected itself to negligence liability. Under the ITCA, liability is the rule with certain specific exceptions. *Sterling v. Bloom*, 111 Idaho 211, 214-15, 723 P.2d 755, 758-59 (1986). The discretionary function exception to governmental liability is contained in I.C. § 6-904(1):

6-904. **Exceptions to governmental liability.**—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

1. ... [is] based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

In *Sterling,* our Supreme Court adopted a planning/operational test for determining

whether a particular governmental action is discretionary, and therefore immune under I.C. § 6–904(1). "The planning/operational test provides immunity for planning activities—activities which involve the establishment of plans, specifications and schedules where there is room for policy judgment and decisions. Operational activities—activities involving the implementation of statutory and regulatory policy—are not immunized and, accordingly, must be performed with ordinary care." *Jones v. City of St. Maries*, 111 Idaho 733, 736–37, 727 P.2d 1161, 1164-65 (1986) (citing *Sterling*, 111 Idaho at 229-30, 723 P.2d at 773–74).

■ For the purposes of this appeal, we will assume the truth of Lindsey's allegation that the City's delay in acquiring her property was negligent. The question thus becomes whether the City's negligent failure to acquire Lindsey's property with reasonable promptness was a planning (discretionary) or operational activity. In *Sterling*, our Supreme Court noted that the discretionary function exception generally includes "determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." *Sterling*, 111 Idaho at 228–29, 723 P.2d at 772–73 (quoting *Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953)). The focus is not so much on the level of the decision as on the nature of the decision, whether planning or operational. *Sterling*, 111 Idaho at 229 n. 10, 723 P.2d at 773.

> Routine, everyday matters not requiring evaluation of broad policy factors will more likely than not be 'operational.' Decisions and actions which involve a consideration of the financial, political, economic and social effects of a given plan or policy will generally be 'planning' and fall within the discretionary function exception.

*Ransom v. City of Garden City*, 113 Idaho 202, 205, 743 P.2d 70, 73 (1987) (citation omitted).

In this case, the City's decision when to commence the acquisition of Lindsey's property was discretionary. While the City had determined to acquire Lindsey's property in order to obtain the right-of-way for the street project, there was no established policy or regulation governing or confining the City's discretion in determining when to acquire the property. The decision when to acquire Lindsey's property was a matter which implicated various financial, political, economic and social considerations. During the time in question the City had numerous projects and responsibilities placing competing demands on its financial and human resources. The proper allocation of those resources in pursuing those projects and responsibilities implicated various financial, political, economic and social considerations, and thus was a matter within the discretion of the City. While it is true that the City had resolved to perform the street improvement project, and that the City was required to follow numerous state and federal policies and regulations in order to qualify the project for federal funding, the decisions whether, and at what pace, to pursue that process always remained entirely within the discretion of the City. This was the type of determination "made by executives or administrators in establishing plans, specifications or schedules of operations," the type of determination expressly recognized by our Supreme Court as being within the discretionary function exception of I.C. § 6–904.

Our conclusion that the alleged conduct of the City in this case falls within the discretionary function exception is in accordance with the purposes of the discretionary function exception. Those purposes have been identified as:

> (1) to permit those who govern to do so without being unduly inhibited in the performance of that function by the threat of liability for tortious conduct; and (2) to limit judicial re-examination of basic policy decisions properly entrusted to other branches of government.

*Ransom*, 113 Idaho at 205, 743 P.2d at 73 (citation omitted). When and how many financial and human resources should be allocated to perform the myriad tasks of

running the City of Lewiston are basic policy decisions properly entrusted to other branches of government, and it would contravene the purpose of the discretionary function exception to allow the City's decisions on those matters to be reviewed by the judicial process. Review of those decisions has been properly reserved for the political process.

Based on the facts and reasons stated above, we hold that the City is immune from liability for the conduct alleged by Lindsey, and therefore the district court did not err in granting a directed verdict to the City on that claim.

### 2. *Lindsey's Inverse Condemnation Claim.*

Lindsey asserts that the City violated her rights under the Fifth Amendment of the United States Constitution, which provides that "private property [shall not] be taken for public use, without just compensation."[1] Lindsey claims that between December of 1984, and August of 1988, city officials repeatedly advised her not to occupy or improve her property because the City was about to take the property for public use. Lindsey asserts that the City's conduct constituted a taking of her property without compensation. In response to Lindsey's claim, the City asserts that it never interfered with Lindsey's use of her property until August 31, 1988, when the City instituted the proceedings to condemn Lindsey's property. At trial, the City contended that under section 7–712 of Idaho's eminent domain statute, I.C. §§ 7–701 to 7–721, Lindsey's right to compensation for the taking of her property did not begin to accrue until she was served with the summons in the City's eminent domain action. In ruling on Lindsey's inverse condemnation claim, the district court referred to I.C. § 7–712; however, the court also made specific findings to support its conclusion that no taking of Lindsey's property occurred prior to the date when the City commenced the eminent domain proceedings. While

we reject the application of I.C. § 7–712 to Lindsey's inverse condemnation action, we affirm the district court's conclusion that no taking of Lindsey's property occurred prior to August 31, 1988.

■ Lindsey does not dispute that she received due process and just compensation for her property once it was condemned by the City. However, she claims that the City's actions prior to the initiation of the condemnation proceedings deprived her of the use and enjoyment of her property, and thus constituted a taking, for which she did not receive just compensation. Thus, Lindsey's claim is an action for inverse condemnation. In a regular condemnation case the government initiates proceedings to condemn property for public use in the exercise of its power of eminent domain. An inverse condemnation action, such as the one before us, is "instituted by a property owner who asserts that his property, or some interest therein, has been invaded or appropriated to the extent of a taking, but without due process of law, without payment of just compensation." *Rueth v. State,* 100 Idaho 203, 217, 596 P.2d 75, 89 (1978). Through her counterclaim for inverse condemnation, Lindsey has not sought compensation for the taking which occurred by virtue of the City's condemnation action, but for the City's alleged interference with her property rights prior to the initiation of the City's condemnation action.

■ The United States Supreme Court has held that landowners are entitled to bring actions in inverse condemnation by virtue of the Fifth Amendment's guarantee of just compensation for the taking of private property. *First English Evangelical Lutheran Church v. Los Angeles County,* 482 U.S. 304, 315, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987). At trial, the City asserted that, under I.C. § 7–712, Lindsey's right to compensation for the taking of her property did not accrue until she was served with the summons in the City's con-

---

**1.** Lindsey has not asserted the right guaranteed by the takings clause of Art. I § 14 of the Idaho Constitution, which provides that "[p]rivate property may be taken for public use, but not

until a just compensation, to be ascertained in the manner prescribed by law, shall be paid therefore."

demnation action. Idaho Code § 7–712 provides as follows:

> For the purpose of assessing compensation and damages, the right thereto shall be deemed to have accrued at the date of the summons [in the eminent domain proceedings], and its actual value, at that date, shall be the measure of compensation for all property to be actually taken, and the basis of damages to property not actually taken, but injuriously affected, in all cases where such damages are allowed, ..."

This section clearly places a prospective time limit, from the date of the summons, on the compensatory relief available in ordinary condemnation proceedings where the government acts to condemn property in the exercise of its power of eminent domain. The City would have us construe this section to likewise limit a landowner's right to compensation in an inverse condemnation action. However, if we were to construe the statute to prohibit compensation for takings which occur prior to the date of summons in eminent domain proceedings, it would effectively abolish the right to obtain the relief sought in inverse condemnation actions. This is because "the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings." *First Lutheran Church*, 482 U.S. at 316, 107 S.Ct. at 2386. Because I.C. § 7–712 chronologically limits the right to compensation from the date of the summons in an eminent domain proceeding, that section cannot be construed to govern the right to compensation in an inverse condemnation action, which is an action predicated on the proposition that a taking occurred without such formal proceedings. Accordingly, to the extent that the district court relied on I.C. § 7–712 in concluding that no taking of Lindsey's property occurred prior August 31, 1988, the district court was in error.

However, the record in this case reveals that the district court also based its conclusion on the following factual findings:

> [T]he city never made a commitment with regard to when the property would be taken or how much would be paid prior to the time that an actual offer was made and that the city never legally or actually interfered with [Lindsey's] use of her property.

> There was no actual or legal loss to [Lindsey] of her property caused by the actions of the city. [Lindsey] could still use her property. The evidence is quite clear in its indication that [Lindsey] could still use her property, still continued to use her property, used it for security for a loan, her daughter continued to live there for a period of time, the property was rented out for a period of time during this period of time.

■ Lindsey asserts on appeal that the district court erred in making these factual findings, contending that these factual issues were questions for the jury to decide. We disagree. With respect to the adjudicative roles of the judge and jury in inverse condemnation cases, our Supreme Court has held that, "as in ordinary eminent domain proceedings, all issues, whether legal or factual, other than just compensation, are for resolution by the trial court. *Rueth*, 100 Idaho at 222–23, 596 P.2d at 94–95; *Tibbs v. City of Sandpoint*, 100 Idaho 667, 670, 603 P.2d 1001, 1004 (1979). It is for the court to determine whether a taking occurred, the nature of the property interest taken, and when the taking occurred. Once the trial court has made these findings, the extent of the damages and the measure thereof become questions for the jury. *Tibbs*, 100 Idaho at 670, 603 P.2d at 1004. Our Supreme Court has stated that it is desirable that the trial court enter findings and conclusions pertinent to all issues other than just compensation. *Rueth*, 100 Idaho at 222–23, 596 P.2d at 94–95. Accordingly, we hold that the decision whether and when a taking occurred in this case was a matter for the district court to determine. We must now consider whether the district court erred in making that determination.

■ Our Supreme Court has held that whether a taking has occurred in a particular case is ultimately a question of law. *Tibbs*, 100 Idaho at 670, 603 P.2d at 1004.

However, a district court's determination when a taking occurred in an inverse condemnation case is a factual one which is reviewed on appeal for substantial evidence. *Rueth v. State,* 103 Idaho 74, 77–79, 644 P.2d 1333, 1336–38 (1982). In this case, the trial court's determination that no taking occurred prior to August 31, 1988, is predicated on the court's factual finding that the City never interfered with Lindsey's use of her property prior to that date. That finding is supported by substantial, although conflicting evidence in the record, and we will not disturb it on appeal. Based on this finding, the district court reached the legal conclusion that no taking occurred prior to August 31, 1988. Because the district court's conclusion that no taking occurred prior to August 31, 1988, is supported by the facts as properly found, we affirm the district court's conclusion. Once the district court concluded that no taking occurred prior to August 31, 1988, there were no facts upon which the jury could have returned a verdict in favor of Lindsey on her inverse condemnation claim. Accordingly, the district court did not err in directing a verdict against Lindsey on that claim.

## CONCLUSION

Based on the facts and reasoning set forth above, we hold that Lindsey's negligence and inverse condemnation claims against the City were unfounded as a matter of law. All other arguments raised by Lindsey on appeal have been considered and rejected. Accordingly, we affirm the verdict directed by the district court against Lindsey's counterclaim.

Costs are awarded to the City pursuant to I.A.R. 40. No attorney fees are awarded on appeal.

WALTERS, C.J., and SWANSTROM, J., concur.